# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00286-CR

---

**Jaime Villanueva Castro, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 390TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-00-002647, THE HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

A jury convicted Jaime Villanueva Castro, who absconded during his trial, on both counts of a two-count indictment charging him with the first-degree felony offense of aggravated sexual assault of a young child and the second-degree felony offense of indecency with a child by sexual contact, committed against eight-year-old A.B. *See* Tex. Penal Code §§ 21.11(a)(1), 22.021(a)(1)(B)(i), (2)(B). The jury assessed punishment at fifty years' imprisonment on the first count and twenty years' imprisonment on the second. *See id.* §§ 12.32, .33. The district court rendered judgments of conviction on the jury's verdict and ordered that the sentences run concurrently.

In six issues on appeal, Castro contends that his convictions for both offenses violate the Fifth Amendment's prohibition against double jeopardy, that his trial counsel provided ineffective assistance, and that the court reporter's destruction of the voir dire record

more than fifteen years after the trial entitles him to a new trial. Because of the double-jeopardy violation, we will vacate the judgment of conviction for indecency with a child by sexual contact and affirm the judgment of conviction for aggravated sexual assault of a young child.

**BACKGROUND**

After Castro attended the first and second day of his jury trial in 2002, he failed to appear for the remainder of his trial, his bond was forfeited, and the district court issued a capias. Trial continued without Castro. During trial, the jury heard evidence that on November 8, 1999, when A.B. was eight years old, she lived in an apartment with her two younger brothers, her mother, mother's boyfriend, mother's husband, and one of her husband's brothers, Santiago.[1] On that date, some visitors were also staying at the apartment, including a man nicknamed "Chaparro" or "Shorty," and another of husband's brothers, Castro.[2] That night, Castro and the other men in the apartment played games and drank beer at the kitchen table while A.B., her brothers, and her mother were sleeping in the bedroom that they shared. During the night, Castro went into the bedroom and put his finger inside A.B.'s vagina.

A.B., who testified that she was ten years old and in fifth grade at the time of the 2002 trial, also testified specifically that "Jaime [Castro] touched [her]" "[w]ith his finger," "[o]n [her] private part," "down there," which she acknowledged as her vagina. Using a female doll, A.B. pointed to the "private part" where he touched her. Further, A.B. clarified that his finger went inside her private part. Using a male doll, A.B. demonstrated how he came up to her and

_____

[1] A.B.'s mother testified that she married Ismael Castro "to fix his papers," that they resided in separate rooms of the apartment, and that they did not have a physical relationship. Ismael's brother is the appellant, Jaime Villanueva Castro.

[2] We refer to the brothers by their first names for clarity because Ismael, Santiago, and Castro share the same last name.

"sort of bent down." A.B. testified that she was wearing a nightgown, that he touched her underneath her clothing and underwear, and that he went through the leg part of the underwear to touch her vagina with his finger. A.B. recalled that afterward, he went into the restroom, and she fell back to sleep. He later returned to the bedroom, and A.B. testified that "when he tried to do it the second time, I woke up, and I told my mom." The prosecutor asked A.B., "Now did you say he came out a second time?" A.B. responded, "Yes, but he tried to touch me, but I woke up and told my mom." The prosecutor asked, "What did you tell your mom?" A.B. replied, "That he touched me."

A.B.'s mother testified that A.B. was in third grade and under fourteen years of age on November 8, 1999. That night, Castro went into the bedroom and woke A.B.'s mother to borrow a cassette, which she gave to him. Later that night, A.B. woke her mother and said, "Ismael's brother, Jaime [Castro] keeps on coming into my room, touching my butt." A.B. pointed to Castro when her mother asked who did it. A.B.'s mother confronted Castro, who said that A.B. was lying and must have been dreaming about him. A.B.'s mother told Castro that she wanted him out of her house, and when she told him that she was going to call the police, Castro said "he wasn't going to leave," that "[h]e had nothing to hide or he wasn't scared or something, but he left the next day." She testified that after Castro was charged, his brothers Ismael and Santiago told her boyfriend that they wanted her "to drop the charges, and they offered [her] money." On cross-examination, she acknowledged that she did not know for a fact that Castro had put them up to it.

After A.B.'s mother testified, the jury heard from Camille Haberman, a counselor who conducted A.B.'s forensic interview. Haberman testified that A.B. said "her mother's husband's brother" went into a bedroom where she was sleeping, touched her vagina—which

3

A.B. called her "private"—with his hand, and went "in the inside" of her vagina with his finger and moved it up and down. Haberman also testified that "the first time was when the sexual contact occurred and that had awoken [A.B.], and then [A.B.] said he came a second time and was attempting to take the covers off of her, and that's when she woke up for the second time, and then woke her mother."

Next, the jury heard from Dr. Beth Nauert, a pediatrician who examined A.B. Dr. Nauert testified that A.B. reported that her mother's husband's brother, "not Santiago," touched her on her "private part, inside [her] clothes where [her] butt's at." On cross-examination, Dr. Nauert noted that A.B. said "[Castro] tried to touch [her], but [she] woke up" and acknowledged that she did not know whether there was any contact made "on the second time."

The last witness was Dr. William Carter, a psychologist specializing in treatment of sexually abused children. Dr. Carter testified that to a child, "butt" and "private parts" could mean the same thing and could describe "just the whole region." Thus, he agreed that A.B.'s statement to Dr. Nauert that, "He touched me on my private part inside my clothes where my butt's at," was consistent with what A.B. told her mother and Haberman. After considering A.B.'s behaviors and symptoms, Dr. Carter opined that "the picture presented [here] is not at all inconsistent with a sexual abuse case."

At the conclusion of the trial, the jury convicted Castro of both offenses as charged. The jury assessed punishment, and the district court sentenced Castro in absentia after determining that Castro had "voluntarily absented himself from [the] proceedings" starting on the third day of his trial. *See* Tex. Code Crim. Proc. art. 33.03. He remained at large for almost

4

nine years.[3]  Castro was extradited to Texas and brought before a Travis County magistrate on April 15, 2011.  The Travis County Sheriff transferred custody of Castro to the Texas Department of Criminal Justice on May 20, 2011.

The court reporter who had taken the record of voir dire proceedings in Castro's trial on May 6, 2002, destroyed her portion of the record sometime after May 2017.  She averred that it is her practice to retain case records for fifteen years and after that destroy all tapes and paperwork.  She also averred that she retired in 2012 and that no one contacted her about the record until December 2018, at which point her records had already been destroyed.  Castro filed an unsuccessful pro se application for habeas corpus relief in 2017 alleging ineffective assistance of counsel.  He filed another application for habeas relief in 2018, also alleging ineffective assistance of counsel, and had counsel appointed to represent him on it.  The Court of Criminal Appeals dismissed that habeas application.

Castro's sentence was pronounced in his presence at a hearing on April 17, 2019.  *See id.* art. 42.03, § 1.  On June 13, 2019, the district court held an evidentiary hearing on Castro's motion for new trial.  Defense counsel testified at the hearing but said, "it's been 17 years," and "I don't remember the specifics about the trial."  He also said that "he was limited to what he could do" during the punishment phase of trial when Castro "didn't come back."  The district court denied the motion for new trial by written order.  This appeal followed.

---

[3]  In 2011, Castro was arrested in Oregon for repeatedly sexually abusing his adolescent stepdaughter.

## DISCUSSION

### Multiple-Punishments Double-Jeopardy Claim

In his first issue, Castro contends for the first time on appeal that his convictions for both aggravated sexual assault of a child and indecency with a child by sexual contact as charged in counts one and two violate the constitutional prohibition against double jeopardy because he was subjected to multiple punishments for the same offense.

The Double Jeopardy Clause of the federal and Texas constitutions, in relevant part, prohibits multiple punishments for the same offense in a single prosecution. *See* U.S. Const. amend. V; Tex. Const. art. 1, § 14; *see also Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App. 2018). Preservation of a multiple-punishments double-jeopardy claim for appellate review generally requires a defendant to object at or before the charge is submitted to the jury. *Gonzalez v. State*, 8 S.W.3d 640, 643-46 (Tex. Crim. App. 2000). However, we may consider the merits of a defendant's multiple-punishments double-jeopardy claim that is raised for the first time on appeal "when (1) the undisputed facts show that the double jeopardy violation is clearly apparent on the face of the record, and (2) enforcement of the usual rules of procedural default serves no legitimate state interests." *Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014) (citing *Gonzalez*, 8 S.W.3d at 643); *see Langs v. State*, 183 S.W.3d 680, 682 (Tex. Crim. App. 2006) ("[T]he face of the trial court record must clearly show a double jeopardy violation before a defendant may successfully raise a 'multiple punishment' double jeopardy claim for the first time on appeal").

Here, the record reflects that no double-jeopardy claim was presented by defense counsel during Castro's trial in 2002 or by appellate counsel in the motion for new trial filed in

2019. Because Castro raises his double-jeopardy claim for the first time on appeal, we must determine whether a double-jeopardy violation is clearly apparent on the face of the record from his trial. *See Garfias*, 424 S.W.3d at 58; *Langs*, 183 S.W.3d at 687. "A multiple-punishments double-jeopardy violation may arise either in the context of lesser-included offenses (when the same conduct is punished under both a greater and a lesser-included statutory offense) or when the same criminal act is punished under two distinct statutory provisions, but the legislature intended only one punishment." *Aekins v. State*, 447 S.W.3d 270, 274 (Tex. Crim. App. 2014); *Garfias*, 424 S.W.3d at 58.

The true inquiry in a multiple-punishments case is whether the Legislature intended to authorize the separate punishments. *Garfias*, 424 S.W.3d at 58. Whether the Legislature intended to authorize separate punishments is assessed in two ways as follows: (1) analyzing the elements of the offenses and (2) identifying the appropriate "unit of prosecution" for the offenses. *Id.* When two distinct statutory provisions are at issue, the offenses must be considered the same under both an "elements" analysis and a "units" analysis for a double-jeopardy violation to occur. *Ex parte Benson*, 459 S.W.3d 67, 71 (Tex. Crim. App. 2015); *see Maldonado v. State*, 461 S.W.3d 144, 150-51 (Tex. Crim. App. 2015) (Keller, P.J., concurring) ("When the offenses at issue are codified in two distinct statutory provisions, the offenses must be considered the same under *both* analyses for a double-jeopardy violation to occur.").

### 1. "Elements" analysis

An "elements" analysis in the two-statute context begins with the test set forth in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), which asks "whether each provision

requires proof of a fact which the other does not," *Ex parte Benson*, 459 S.W.3d at 72. In an "elements" analysis, a court may not consider the evidence presented at trial. *Id.* at 72. The indictment here charged Castro with aggravated sexual assault of young child in Count 1 and indecency with child by sexual contact in Count 2 occurring on or about the same day. *See* Tex. Penal Code §§ 21.11(a)(1), 22.021(a)(1)(B)(i), (2)(B). Count 1 charged Castro with "knowingly and intentionally caus[ing] the penetration of the female sexual organ of [A.B.], a child younger than 14 years and not his spouse, by the finger of said JAIME VILLANUEVA CASTRO." Count 2 alleged that Castro, "with the intent to arouse and gratify his sexual desire[,] knowingly and intentionally engage[d] in sexual contact by touching the genitals of [A.B.,] a child younger than 17 years of age and not his spouse."

Under an "elements" analysis, the offense of indecency with a child by sexual contact charged here is incident to and subsumed by the offense of aggravated sexual assault of a child. *See Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004) (noting that record in that case did not show separate offenses of child-sexual abuse); *cf. Maldonado*, 461 S.W.3d at 150 (noting that count alleging sexual contact is not subsumed by count alleging penetration where there is evidence of multiple incidents of both contact and penetration that could have formed basis for each count); *see id.* at 150-51 (Keller, P.J., concurring) (applying *Blockburger* test to conclude that there were not separate offenses of child-sexual abuse) (citing *Evans v. State*, 299 S.W.3d 138, 141-43 (Tex. Crim. App. 2009)). The indecency-with-a-child-by-sexual-contact offense—Castro's touching of A.B.'s genitals with intent to arouse and gratify his sexual desire when A.B. was younger than seventeen—requires no greater proof of facts than that necessary to establish the aggravated-sexual-assault-of-a-young-child offense—penetration of A.B.'s sexual organ by Castro's finger when A.B. was younger than fourteen. *See Ochoa v.*

8

*State*, 982 S.W.2d 904, 910 (Tex. Crim. App. 1998) (Keller, P.J., concurring) (noting that "[p]roving that a child is under age fourteen will necessarily also prove that the child is under age seventeen"; that "both statutory provisions exclude spouses from their reach"; and that "touching the female sexual organ with the intent to arouse or gratify sexual desire is a lesser-included species of conduct of the intentional or knowing penetration of the female sexual organ"); *see also Aekins*, 447 S.W.3d at 279 (noting that "[w]hat matters is the sexual assault upon the victim, not what the defendant used to commit that discrete assault"). But even if the offense of indecency with a child by sexual contact as charged here is incident to and subsumed by the offense of aggravated sexual assault of a child under an elements analysis, there is no double-jeopardy violation if the offenses constitute separate allowable units of prosecution. *Ex parte Benson*, 459 S.W.3d at 73; *see Maldonado*, 461 S.W.3d at 150 (noting that evidence in case showed multiple instances of conduct); *Rubalcado v. State*, 424 S.W.3d 560, 571 (Tex. Crim. App. 2014) (noting that offenses having common elements under *Blockburger* test are nevertheless separate if they involve separate allowable units of prosecution). We consider the allowable unit of prosecution when conducting the "units" analysis.

### 2. "Units" analysis

In a "units" analysis, we "determine[e] such things as whether there were two murder victims, whether a victim who was assaulted on Monday was assaulted again on Tuesday, or whether multiple kinds of sex acts were committed against a victim." *Ex parte Benson*, 459 S.W.3d at 73. The "units" analysis consists of two parts: (1) what the allowable unit of prosecution is, and (2) how many units have been shown. *Id.* The first part of the "units" analysis is purely a question of statutory construction and generally requires ascertaining the

9

focus or gravamen of the offense. *Id.* at 73-74. The second part of the "units" analysis requires examination of the trial record, which can include the evidence presented at trial. *Id.*

We begin our "units" analysis by addressing the gravamen of the two offenses for which Castro was convicted in this case. "[T]he gravamen of the indecency-with-a-child statute is the nature of the prohibited conduct, regardless of whether the accused is charged with contact or exposure[.]" *Speights v. State*, 464 S.W.3d 719, 722-23 (Tex. Crim. App. 2015) (quoting *Loving v. State*, 401 S.W.3d 642, 649 (Tex. Crim. App. 2013)). "[T]he allowable unit of prosecution for indecency with a child by contact is the commission of the prohibited touching." *Loving*, 401 S.W.3d at 648. The commission of each prohibited act determines how many convictions may be had for a particular course of conduct. *Id.* at 649.

"The gravamen of the offense of aggravated sexual assault of a child is penetration." *Williams v. State*, 474 S.W.3d 850, 855 (Tex. App.—Texarkana 2015, no pet.) (citing *Jourdan v. State*, 428 S.W.3d 86, 96 (Tex. Crim. App. 2014) ("Thus defined, the gravamen of the subsection is penetration, not the various and unspecified 'means' by which that penetration may be perpetrated, which are not elemental.")). "In an aggravated sexual assault of a child case, there are as many allowable units of prosecution as the evidence shows that the defendant committed." *Id.* That is, one may be prosecuted for as many victims or orifices as the actor penetrates. *Id.* (citing *Jourdan*, 428 S.W.3d at 96 ("Accordingly, a defendant may be susceptible to prosecution under Section 22.021(a)(1)(A)(i) [statute prohibiting intentionally or knowingly causing penetration of anus or sexual organ of another person by any means, without that person's consent] for as many 'persons' as he penetrated during the same transaction, and for as many statutorily delineated orifices as the evidence may show he penetrated.")).

10

Under the second part of the "units" analysis, we consider the evidence presented at trial to determine how many units have been shown and whether the evidence would actually support conviction and punishment under each theory of the offense. *See Stevenson v. State*, 499 S.W.3d 842, 851 (Tex. Crim. App. 2016). The undisputed facts in the record of the trial below do not show multiple instances of Castro's touching A.B.'s genitals—one of which would be incident to the penetration of her sexual organ—as necessary to support his convictions for both aggravated sexual assault of a young child and indecency with a child by sexual contact committed against the same child.

As we have noted, A.B.'s testimony was that "Jaime [Castro] touched [her]" "[w]ith his finger," "[o]n [her] private part," "down there," which she acknowledged as her vagina. A.B. used a female doll to identify the "private part" where he touched her, and she clarified that his finger was inside her private part. A.B. testified that she was wearing a nightgown, that he touched her underneath her clothing and underwear, and that he went through the leg part of the underwear to touch her vagina with his finger. She also stated that she was ten years old and in fifth grade on the day she testified in 2002. Her testimony describing Castro's penetration of her sexual organ supports his conviction for aggravated sexual assault of a young child. *See* Tex. Code Crim. Proc. art. 38.07(b)(1) (providing that testimony of sexual-assault victim who was younger than seventeen at time of assault is sufficient to support conviction); Tex. Penal Code § 22.021(a)(1)(B)(i), (2)(B) (defining aggravated sexual assault of child younger than age fourteen); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978) (holding that victim's testimony alone is sufficient evidence of penetration); *Lee v. State*, 186 S.W.3d 649, 655 (Tex. App.—Dallas 2006, pet. ref'd) ("The testimony of the child victim alone is sufficient to support a conviction for sexual assault."). Additionally, the counselor who

11

conducted A.B.'s forensic interview testified about A.B.'s description of a sexual assault involving penetration, namely that "her mother's husband's brother" went into a bedroom where she was sleeping, touched her vagina—which A.B. called her "private"—with his hand, and went "in the inside" of her vagina with his finger and moved it up and down. Based on the evidence in the record from trial, the penetration of A.B.'s sexual organ is one allowable unit of prosecution.

A.B. also testified about events that occurred after the penetration offense. She stated that after she fell back to sleep, Castro returned to the bedroom and "when he tried to do it the second time, I woke up, and I told my mom." A.B. further stated, "[H]e tried to touch me, but I woke up and told my mom." A.B.'s mother testified that A.B. woke her and said, "Ismael's brother, Jaime [Castro] keeps on coming into my room, touching my butt." Dr. Carter testified that to a child, "butt" and "private parts" could mean the same thing and could describe "just the whole region." Haberman testified about both events, stating that "the first time was when the sexual contact occurred and that had awoken [A.B.], and then [A.B.] said he came a second time and was attempting to take the covers off of her, and that's when she woke up for the second time, and then woke her mother." The pediatrician who examined A.B. acknowledged that she did not know whether there was any contact made "on the second time" and testified about A.B.'s report that "[Castro] tried to touch [her], but [she] woke up." Evidence presented during trial about this subsequent event describes an incomplete or attempted touching of A.B. that Castro "tried" to commit, but not the actual commission of a prohibited sexual touching that would constitute an allowable unit of prosecution for indecency with a child by contact.

Thus, the "units" analysis of this trial record shows that there was only one allowable unit of prosecution—for the sexual offense involving penetration of the sexual organ

12

of a child—committed against one victim, A.B. The Court of Criminal Appeals has stated that "multiple convictions for one complete, ultimate sexual assault violate the Double Jeopardy Clause." *Aekins*, 447 S.W.3d at 279. Because the evidence at trial fails to show a sufficient number of separate instances of sexual abuse that would constitute separate allowable units of prosecution encompassing both of the sexual offenses charged in the indictment, Castro's conviction for both offenses presents a double-jeopardy violation. *See Ex parte Benson*, 459 S.W.3d at 73; *cf. Maldonado*, 461 S.W.3d at 150 (noting that evidence in case showed multiple instances of conduct). Because Castro has shown that a double-jeopardy violation is clearly apparent on the face of the record and enforcement of the usual rules of procedural default serves no legitimate state interests, we sustain his first issue. *See Garfias*, 424 S.W.3d at 58; *Langs*, 183 S.W.3d at 687; *see also Ex parte Denton*, 399 S.W.3d 540, 545 (Tex. Crim. App. 2013) (noting that although State may have interest in maintaining finality of conviction, there is no legitimate interest in maintaining conviction where record shows that conviction was obtained in contravention of constitutional double-jeopardy protections). The proper remedy for impermissible multiple convictions and punishments is to retain the most serious offense and vacate the other. *Evans*, 299 S.W.3d 141. Here, the first-degree felony of aggravated sexual assault of a young child is a more serious offense than the second-degree felony of indecency with a child by sexual contact. Accordingly, we vacate Castro's conviction for the second-degree felony offense of indecency with a child by sexual contact and proceed to address Castro's remaining issues.

**Ineffective-Assistance-of-Counsel Claim in Motion for New Trial**

In his second through fifth issues, Castro contends that his counsel provided ineffective assistance during trial. When, as here, a defendant raises an ineffective-assistance-of-counsel claim in a motion for new trial, we review the trial court's denial of that motion under an abuse of discretion standard. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). This deferential standard requires us to view the evidence in the light most favorable to the trial court's ruling. *Id.* We must uphold that ruling if it is within the zone of reasonable disagreement and reverse that ruling only if no reasonable view of the record could support it. *Id.*

An ineffective-assistance-of-counsel claim requires the defendant to prove (1) counsel's deficient performance and (2) prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010). The deficient-performance component of the *Strickland* standard requires the defendant to prove by a preponderance of the evidence that his counsel's performance fell below the standard of prevailing professional norms. *Strickland*, 466 U.S. at 688; *Perez*, 310 S.W.3d at 893. Our review of defense counsel's performance is "highly deferential," and counsel is afforded a "strong presumption" that his conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Perez*, 310 S.W.3d at 893. To rebut that presumption, a defendant's ineffective-assistance claim must be "firmly founded in the record," and the record "must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

The prejudice component of the *Strickland* standard requires proof by a preponderance of evidence that, but for counsel's deficiency, there is a reasonable probability—

sufficient to undermine confidence in the outcome—that the result of the trial would have been different. *Strickland*, 466 U.S. at 694; *Perez*, 310 S.W.3d at 893. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 694; *Perez*, 310 S.W.3d at 894. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *see Perez*, 310 S.W.3d at 893.

## 1. Hearsay complaint about A.B.'s report to her mother

Castro's first allegation of ineffective assistance faults defense counsel for not objecting to hearsay testimony from A.B.'s mother, who recalled A.B. saying that Castro kept coming to her room and that "he touched her butt." Castro contends that an objection was necessary and that this statement was not an outcry of abuse because it "was not detailed enough to describe a sexual assault offense."

However, Castro failed to show that but for the lack of objection to this testimony there is a reasonable probability that the outcome of the trial would have been different. *See Strickland*, 466 U.S. at 694; *Perez*, 310 S.W.3d at 893. Erroneous admission of testimony is harmless if the same or similar evidence is admitted without objection at another point in the trial. *Leday v. State*, 983 S.W.2d 713, 717-18 (Tex. Crim. App. 1998). By the time A.B.'s mother testified, the jury had already heard A.B.'s detailed, firsthand account about what transpired both times when she was awakened by Castro in the bedroom. As we have noted, A.B. testified about Castro's penetration of her sexual organ and stated her age and grade in school. Immediately after describing the event when his finger was "inside" her private part, A.B. stated that she "fell back to sleep, and when he tried to do it the second time, I woke up, and

15

I told my mom." Because evidence similar to—and some more detailed than—the testimony from A.B.'s mother was admitted without objection beforehand, Castro failed to make the necessary showing of prejudice as to this hearsay complaint. *See id.*

### 2. Hearsay complaint about offer of money to drop charges

Castro's second allegation of ineffective assistance faults defense counsel for not objecting to hearsay testimony from A.B.'s mother when she stated that Castro's brothers had communicated to her boyfriend an offer of money for her to drop the charges. Texas Rule of Evidence 802 prohibits hearsay except as provided by statute or other rule prescribed pursuant to statutory authority. *See* Tex. R. Evid. 802. Hearsay is defined as a statement, other than one made by the declarant while testifying at the current trial or hearing, that a party offers in evidence to prove the truth of the matter asserted in the statement. *Id.* R. 801(d). Thus, a statement is not hearsay if it is not offered to prove the truth of the matter asserted. *Guidry v. State*, 9 S.W.3d 133, 152 (Tex. Crim. App. 1999); *see* Tex. R. Evid. 801(d)(2). That is, "a statement is not hearsay if its relevancy does not hinge on its truthfulness." *Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

The State points out that the testimony about the Castro brothers' communication of the offer to mother's boyfriend was not offered to prove that they would actually pay her to drop the case; rather, it was evidence from which the jury could infer a consciousness of guilt. "Efforts of third parties who attempt to tamper with witnesses at the defendant's behest may be admissible as evidence of consciousness of guilt." *State v. Villegas*, 506 S.W.3d 717, 749 (Tex. App.—El Paso 2016, no pet.); *see Gonzalez v. State*, 117 S.W.3d 831, 842 (Tex. Crim. App. 2003) (noting that allegation that defendant, through his attorney, attempted to bribe witness for

favorable testimony would support inference that such conduct demonstrated defendant's consciousness of guilt for charged crime).  Counsel is not ineffective if he refrains from objecting to admissible testimony.  *Ex parte Jimenez*, 364 S.W.3d 866, 887 (Tex. Crim. App. 2012); *Agbogwe v. State*, 414 S.W.3d 820, 835 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (concluding that defense counsel's lack of objection to evidence that defendant's friends asked victim to drop charges and ignore subpoena and offered to pay her fines for noncompliance with subpoena did not constitute ineffective assistance of counsel because such evidence was admissible as consciousness of guilt).

Castro replies that the State did not limit its use of this testimony to showing consciousness of guilt but referenced it during closing arguments, specifically when the prosecutor remarked that Castro's family "tried to buy this case," were "trying to get her to drop the charges," and "tried to tamper with her testimony."  Castro notes that a court considers arguments that a party made in the trial court when reviewing the party's claim on appeal that it did not offer testimony for the truth of the matter asserted.  But here, the State presented no argument to the trial court supporting the admissibility of testimony about an offer of money to A.B.'s mother to drop the charges because there was no objection requiring such response.  *Cf. Langham v. State*, 305 S.W.3d 568, 580-81 (Tex. Crim. App. 2010) (noting that State did not argue, in response to defendant's hearsay and Confrontation Clause objections during trial, that confidential informant's out-of-court statements were not offered for truth of matter asserted).

Even so, Castro failed to show that but for the omitted objection to the complained-of testimony there is a reasonable probability that the outcome of the trial would have been different.  *See Strickland*, 466 U.S. at 694; *Perez*, 310 S.W.3d at 893.  Aside from A.B.'s mother's testimony about the communication from Castro's brothers to her boyfriend

about an offer of money for her to drop the charges, the jury heard other evidence about Castro's consciousness of guilt. A.B.'s mother testified that after she confronted Castro—who claimed that A.B. was lying, that he was not leaving, and that he had nothing to hide—he left. She further testified that Castro's family was not helpful to her or the police, who were looking for Castro for "quite some time." *See Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (noting that evidence of flight is admissible as circumstance from which inference of guilt may be drawn). Moreover, the jury saw that Castro was missing from the courtroom at the beginning of the third day of trial, and they learned that he was absent by choice when the district court informed them that the trial would resume because "the law provides when a person has voluntarily absented himself from proceedings, we can proceed." As this Court has noted, consciousness of guilt "is perhaps one of the strongest kinds of evidence of guilt." *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.). Because the jury had other evidence tending to demonstrate consciousness of guilt besides the complained-of hearsay testimony from A.B.'s mother about an offer of money for her to drop the charges, Castro failed to meet his burden of showing prejudice from admission of her testimony.

### 3. Complaint that expert opined on truthfulness of abuse accusation

Castro's third allegation of ineffective assistance faults defense counsel for not objecting to the portion of Dr. Carter's testimony in which he stated that, from what he read in a report from the child-advocacy center, A.B. "made some pretty specific statements that give you confidence that what she's saying is accurate" and that "those are details that . . . she wouldn't know to fake or to talk about unless something like that quite likely happened." Castro contends

18

that Dr. Carter's testimony was tantamount to testifying that A.B. told the truth when she accused Castro of assaulting her.

Expert testimony is inadmissible when it decides an ultimate fact for the jury, such as a direct opinion on the truthfulness of a child complainant's allegations. *See Schutz v. State*, 957 S.W.2d 52, 73 (Tex. Crim. App. 1997) (concluding that expert witnesses provided inadmissible testimony that it was "less likely" that child complainant had been manipulated into making her allegations and that her allegations were not result of fantasy); *Yount v. State*, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993) ("[E]xpert testimony that a particular witness is truthful is inadmissible under Rule 702."). A "fine but essential" line exists between helpful expert testimony and impermissible comments on credibility. *Schutz*, 957 S.W.2d at 60. Thus, expert testimony was inadmissible and counsel was found ineffective for failing to object after a trial where the child did not testify and multiple experts were asked to explain and comment directly on factors they used in determining whether a child was telling the truth. *See Sessums v. State*, 129 S.W.3d 242, 248 (Tex. App.—Texarkana 2004, pet. ref'd) (noting also that State's closing argument specifically discussed that child "must not be a liar" because experienced experts testified and because "[e]very one of them said the kid's telling the truth, he done it. You have got to find that kid is a liar and all those people are fools and don't know what they are doing in order to find him not guilty."). Likewise, counsel was found ineffective in another case for failing to object during a trial where the jury was presented with "extensive, inadmissible testimony" from three witnesses about the truth of the child's sexual-assault claim, including a witness who stated that she was "particularly adroit" at determining whether child's claim was "made-up" and that "family courts tend to assign me very difficult cases that have been seriously contaminated so I can discover what the truth is in those matters." *Miller v. State*, 757 S.W.2d

19

880, 883, 885 (Tex. App.—Dallas 1988, pet. ref'd). Such direct opinions on truthfulness are distinct from expert testimony concerning the common behavioral characteristics of children who have been abused, which may be admissible. *See Yount*, 872 S.W.2d at 708-09 (citing *Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993)); *Jessop v. State*, 368 S.W.3d 653, 691 n.61 (Tex. App.—Austin 2012, no pet.).

Here, as the State notes, Dr. Carter's testimony was provided in the context of describing more generally, outcries containing "details that a child would not know other than . . . having been involved in an act of abuse, touches, smells, things of that nature." After considering A.B.'s behaviors and symptoms, Dr. Carter opined that "the picture presented [here] is not at all inconsistent with a sexual abuse case." Even if defense counsel had objected at trial to this testimony, the district court could have determined, within the zone of reasonable disagreement, that the complained-of testimony from this one witness was distinguishable from the extensive evidence provided by multiple witnesses in *Sessums* and *Miller*. *See Cavett v. State*, No. 07-17-00141-CR, 2018 Tex. App. LEXIS 8498, at *10 (Tex. App.—Amarillo Oct. 17, 2018, no pet.) (mem. op., not designated for publication) (noting that *Sessums* and *Miller* "have unique characteristics" and "are decisions of sister courts that do not include the Third Court of Appeals").

Unlike the attorneys in those cases, defense counsel here elicited testimony from the State's expert that challenged A.B.'s credibility. On cross-examination, Dr. Carter acknowledged that he had never interviewed A.B., that his impressions were based on interviews with children like A.B. but not on any specific information from her, and that his impressions could be wrong. Additionally, Dr. Carter admitted that he could not rule out whether A.B.'s allegations were motivated by "secondary gain," which he described as a child's recognition that

20

"when they talk about this . . . whatever they say, they do get the kind of attention, affection, stroking, whatever it is that is making them feel better, and that, in and of itself, can produce more of the same." Building on that admission, defense counsel asked, "So there is the possibility that secondary gain could have been one of the reasons why [A.B.] gave another person more information or different information than the first?" Dr. Carter responded, "Yes, I'll acknowledge that." Significantly, defense counsel also elicited Dr. Carter's admission that he had no knowledge of whether Castro committed the abuse or whether the abuse had occurred.

Thus, the record reflects that the complained-of testimony from Dr. Carter was but a small portion of a larger amount of evidence that was presented to the jury and that could have been used in determining A.B.'s credibility. *See Barshaw v. State*, 342 S.W.3d 91, 96 (Tex. Crim. App. 2011) ("Even in cases in which credibility is paramount, Texas courts have found harmless error when the inadmissible expert testimony was only a small portion of a large amount of evidence presented that the jury could have considered in assessing the victim's credibility." (citing *Schutz*, 63 S.W.3d at 446)). Assuming that the better strategy would have been for defense counsel to object to Dr. Carter's testimony, when assessed within the overall record of this trial, Castro has not shown that but for the omitted objection to the complained-of testimony from Dr. Carter there is a reasonable probability that the outcome of the trial would have been different. *See Strickland*, 466 U.S. at 694; *Perez*, 310 S.W.3d at 893.

### 4. Complaints that witnesses and mental-health history were not presented

Castro's fourth allegation of ineffective assistance faults defense counsel for not investigating "mitigating evidence" and calling certain witnesses during the punishment phase. Specifically, Castro complains that defense counsel did not call two of Castro's siblings and

Castro's former personal-injury attorney to testify and that defense counsel did not know about Castro's past treatment for depression and did not investigate whether Castro had additional mental-health issues.

The *Strickland* standard does not require defense counsel to present mitigating evidence during sentencing in every case. *Wiggins v. Smith*, 539 U.S. 510, 533 (2003); *see Strickland*, 466 U.S. at 689 (addressing "constitutionally protected independence of counsel"). When considering whether defense counsel conducted an adequate investigation for potential mitigating evidence, we focus on whether the investigation supporting the decision not to introduce mitigating evidence of the defendant's background was reasonable. *Goody v. State*, 433 S.W.3d 74, 80 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *see Wiggins*, 539 U.S. at 522-23. Defense counsel's decision about the necessary amount of investigation is afforded a "heavy measure of deference" and assessed in light of all the circumstances to determine whether reasonable professional judgment would support the decision. *See Strickland*, 466 U.S. at 691. A defendant's ineffective-assistance-of-counsel claim complaining of an uncalled witness must include a showing that the witness's testimony would have benefited the defense. *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007); *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004). An attorney's decision not to present certain witnesses during the punishment phase may be a strategically sound one when it is based on a determination that the witnesses' testimony could be harmful to the defendant. *Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (noting that "defense counsel could have reasonably determined that the potential benefit of additional witnesses or evidence was outweighed by the risk of unfavorable counter-testimony").

Here, during the hearing on the motion for new trial, Castro's brother Ismael testified that on the night in question he and Santiago went to sleep before Castro and Shorty. The next morning, Ismael was awakened by A.B.'s mother and was told about the accusations against Castro. Ismael said that if called at trial, he would have testified that he "didn't see anything" and that "[i]t could have been Shorty." Further, Ismael would have testified that Castro treats children well, although he admitted knowing that after this case, Castro was arrested in Oregon for sexually abusing his teenage stepdaughter. Ismael denied offering money to A.B.'s mother to drop the charges in the case.[4]

Next, Castro's sister, Oralia Castro Villanueva, testified. She said that she had accompanied Castro to court twice but had not been asked to testify in support of him. If called, Villanueva said that she would have testified that Castro treated children well. She admitted knowing about Castro's subsequent case in Oregon involving similar allegations, but she was unaware of whether that case had been finalized.

Castro also testified at the hearing on his motion for new trial. He recalled that before the trial in this case, he had a car accident and hired "Mike Dye" to represent him. Castro stated that "back then," he was given antidepressant medication to treat his depression. Castro stated that defense counsel was unaware of that. Castro did not explain how or if his condition or medications "back then" affected him during the timeframe of the offenses that he was convicted of committing against A.B.

Michael Dye, an Oregon attorney, testified by Skype videoconference at the hearing. He stated that he had previously represented Castro in two personal-injury matters,

---

[4] However, Ismael was not asked if he communicated such an offer to A.B.'s mother's boyfriend.

including an automobile accident in 1994. Dye said that Castro had seen a clinical psychologist, and that Dye "participated in" Castro seeing that psychologist. Dye also said that in 2002, he provided Castro with a referral to a criminal attorney. Dye opined that Castro "was a person of character" and said that Castro's conviction for aggravated sexual assault of a child in this case did not change his opinion about him.

Defense counsel also testified at the hearing on the motion for new trial. He discussed considerations for his decision-making during the punishment phase, noting his concern that testimony from Castro's brothers "m[ight] not have played well for the jury" given the brothers' efforts "to buy off" A.B.'s mother. He testified that he wanted to avoid "that issue being brought back up," especially because he had already elicited testimony from A.B.'s mother on cross-examination "indicat[ing] that [Castro] had nothing to do with it." Additionally, defense counsel testified that he "was limited to what he could do" during the punishment phase of trial when Castro "didn't come back."

Based on the foregoing evidence and considering the high risk that the State would delve into the allegation that Castro's brothers attempted to "buy off" A.B., defense counsel's decision not to call Ismael was reasonable and strategically sound.[5] *See Shanklin*, 190 S.W.3d at 164; *see also Bone*, 77 S.W.3d at 835. Further, as to the complaint that defense counsel did not know about Castro's past treatment for depression and did not investigate whether Castro had additional mental-health issues, we note that nothing in the record shows that Castro was experiencing or had a history of some medical or mental-health impairment, or that

---

[5] The former lead prosecutor in Castro's case testified at the hearing that if Castro's brothers had been called during punishment, she "absolutely" would have questioned them as to Castro's whereabouts and a conversation they may have had with A.B.'s mother because "as a prosecutor you wait for those moments." When the judge asked whether defense counsel had done a good job representing Castro, the former prosecutor stated her belief that he did.

24

he disclosed such matters to defense counsel. *See Purchase v. State*, 84 S.W.3d 696, 700-01 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (rejecting defendant's claim of ineffective assistance and declining to hold that defense counsel must always ask defendants about their mental-health history, even when there are no indicators of such issues). Thus, we cannot conclude that the lack of inquiry into those matters was outside the scope of reasonable professional judgment. *See Strickland*, 466 U.S. at 691.

Moreover, Castro failed to show that the proffered testimony from any of these uncalled witnesses would have benefited his defense. *See Ex parte Ramirez*, 280 S.W.3d at 853; *Ex parte White*, 160 S.W.3d at 52. Ismael's testimony that he "didn't see anything" and both siblings' claims that Castro treated children well would likely have been viewed with skepticism by the jury that had just convicted him of sexual offenses against an eight-year-old child. The jury might have perceived Castro's family members as complicit in his absence from trial, particularly after hearing A.B.'s mother testify that Castro's family was not helpful to her or to the police, who had to look for Castro for "quite some time." And although Castro contends that the jury was deprived of information that his family might have provided about his employment status, his family and community relationships, and his moral character, the record reflects that Ismael and Villanueva provided none of that information in their proffered testimony at the hearing. Dye testified about Castro's employment and mental-health treatment but only around 1994, during the time when Castro was his client. Finally, as the State suggests, calling the family members who might have been perceived as assisting Castro with his absence from trial or producing evidence of treatment for depression following a 1994 car accident as justification or mitigation of Castro's commission of sexual offenses against a child in 1999 had the potential to backfire and harm Castro during sentencing.

25

After assessing all the circumstances and affording a "heavy measure of deference" to defense counsel's decision about the necessary amount of investigation, we conclude that reasonable professional judgment would support counsel's decision not to pursue or present the evidence summarized above. *See Strickland*, 466 U.S. at 691. Having evaluated counsel's effectiveness by looking to the totality of his representation during trial, *see Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999), we conclude that as to these identified allegations of ineffective assistance, Castro failed to: (1) overcome the strong presumption that his counsel's decision not to pursue or present the evidence summarized above fell within the wide range of reasonable professional assistance; and (2) show that his counsel's performance prejudiced his defense and deprived him of a fair trial given a reasonable probability of a different result if counsel had made other decisions about the usefulness and risks of presenting that evidence. *See Strickland*, 466 U.S. at 700; *see also Perez*, 310 S.W.3d at 893. Additionally, after considering the evidence in the light most favorable to the district court's ruling, we conclude that a reasonable view of the record supports the denial of Castro's motion for new trial alleging ineffective assistance of counsel, and thus, that this ruling was not outside the zone of reasonable disagreement. *See Burch*, 541 S.W.3d at 820. We overrule Castro's second through fifth issues.

**Destruction of Voir-Dire Record**

In his sixth and final issue, Castro contends that the court reporter's destruction of the voir dire portion of the record entitles him to a new trial under Texas Rule of Appellate Procedure 34.6(f) and the Due Process Clause of the U.S. Constitution.

26

Under Rule 34.6(f), a party is entitled to a new trial under the following circumstances:

(1) if the appellant has timely requested a reporter's record;

(2) if, *without the appellant's fault*, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed or—if the proceedings were electronically recorded—a significant portion of the recording has been lost or destroyed or is inaudible;

(3) if the lost, destroyed, or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution; and

(4) if the lost, destroyed or inaudible portion of the reporter's record cannot be replaced by agreement of the parties, or the lost or destroyed exhibit cannot be replaced either by agreement of the parties or with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit.

Tex. R. App. P. 34.6(f) (emphasis added). As this Court has noted, if appellant "bears some blame or culpability for the destruction of the [court reporter's] notes, he is not 'without fault' and is not entitled to relief." *Branch v. State*, No. 03-07-00118-CR, 2008 Tex. App. LEXIS 3569, at *10 (Tex. App.—Austin May 16, 2008, pet. ref'd) (mem. op., not designated for publication). Castro acknowledges this authority but contends that in criminal cases, Texas Rule of Appellate Procedure 13.6 also applies, which states in relevant part:

When a defendant is convicted and sentenced, . . . and does not appeal, the court reporter must—within 20 days after the time to perfect the appeal has expired—file the untranscribed notes or the original recording of the proceeding with the trial court clerk. The trial court clerk need not retain the notes beyond 15 years of their filing date.

Tex. R. App. P. 13.6; *see Banks v. State*, 312 S.W.3d 42, 45 (Tex. App.—Dallas 2008, pet. ref'd) (concluding that Rule 13.6 applied because defendant failed to file notice of appeal or otherwise

27

request retention of record until after deadline imposed by Rule 13.6 had passed and that court reporter was required to file untranscribed notes with court clerk to be retained for fifteen years). The court reporter in this case never filed any untranscribed notes or original recording of the voir dire record with the district clerk. However, consistent with her own practice, the court reporter retained the voir dire record herself until "after May 2017," more than fifteen years after Castro's trial. The record reflects that the district clerk provided Castro with a copy of his indictment and judgments of conviction on March 15, 2012, and that on November 12, 2012, Castro informed the district clerk, "I will contact the reporter." The district clerk followed up by providing Castro with the court reporter's contact information. However, the court reporter averred that no one contacted her about the record until 2018.

Castro contends that he "could not appeal the trial court's judgment of conviction" before his sentencing. Further, he contends that because Texas Rule of Appellate Procedure 20.2 allows an appellant to file a motion requesting preparation of the appellate record without charge "within the time for perfecting an appeal," the rule "prevented" him from requesting a no-cost record until after he had been sentenced. We disagree.

"Within the time for perfecting appeal" refers to the period before the filing deadline for an appeal expires and necessarily includes a prematurely filed notice of appeal. *See* Tex. R. App. P. 20.2, 27.1(b); *see also Jones v. State*, No. 05-14-00243-CR, 2015 Tex. App. LEXIS 2418, at *7 (Tex. App.—Dallas Mar. 13, 2015, no pet.) (mem. op., not designated for publication) (affirming denial of defendant's request for free appellate record filed after expiration of "time for perfecting appeal," which was untimely). Rule 27.1(b) states, in relevant part, that in criminal cases "a prematurely filed notice of appeal is effective and deemed filed on the same day, but after, sentence is imposed or suspended in open court." Tex. R. App. P.

28

27.1(b) (stating also that notice of appeal is not effective if it is filed before trial court makes finding of guilt or receives jury verdict). Thus, while a late notice of appeal fails to invoke the jurisdiction of a court of appeals, under Rule 27.1(b), an early notice of appeal may be considered timely. *Smith v. State*, 559 S.W.3d 527, 531 (Tex. Crim. App. 2018). Rule 27.1(b) "allows a notice filed between conviction and sentencing to perfect an appeal of both conviction and sentencing." *Id.* at 534 (comparing this Texas rule with federal rule "intended to protect unskilled litigant who files notice of appeal from a decision that he reasonably but mistakenly believes to be final").

We have likewise determined that in criminal cases, a prematurely filed notice of appeal is one that is filed during the time period after the jury's verdict and before sentence is imposed in open court. *Franks v. State*, 219 S.W.3d 494, 497 (Tex. App.—Austin 2007, pet. ref'd); *see* Tex. R. App. P. 27.1(b); *see also* 4 Texas Criminal Practice Guide § 81.02 (2020) (referencing circumstance where defendant is not sentenced properly before taking his appeal and noting that trial court lacks jurisdiction to resentence defendant while his appeal is pending and mandate has not yet issued from appellate court). Thus, contrary to Castro's contention, he could have filed an appeal of his conviction before he had been sentenced in open court, and that premature filing would have become effective and deemed filed on the day that his sentence was subsequently imposed. *See* Tex. R. App. P. 27.1(b). Similarly, if Castro had filed a motion requesting preparation of a free appellate record before the expiration of his notice-of-appeal deadline, that motion would have been filed "within the time for perfecting an appeal." *See id.* R. 20.2.

Here, the record reflects that Castro absconded from his trial in 2002. The district court found that Castro had voluntarily absented himself from trial. Castro remained a fugitive

for almost nine years until his extradition to Texas in 2011, causing a delay in the oral pronouncement of his sentence in his presence. Notably, Castro does not contend that under these circumstances he is entirely blameless for the court reporter's destruction of the voir dire record. *See id.* R. 34.6(f)(2); *Branch*, 2008 Tex. App. LEXIS 3569, at *10. In similar circumstances, Texas courts have held that a defendant bears some responsibility when a record becomes unavailable years after the defendant became a fugitive. *See Weeks v. State*, 521 S.W.2d 858, 862 (Tex. Crim. App. 1975) (concluding that because defendant became fugitive from justice for two years, he bore "responsibility for the unavailability of the transcription of the court reporter's notes" and was in in "no position to now complain" of their unavailability); *Delasantos v. State*, 673 S.W.2d 634, 635 (Tex. App.—Waco 1984, no pet.) ("Defendant cannot assert that the statement of facts is unavailable through no fault of her own when she remained a fugitive from justice for over 4 years."); *see also Branch*, 2008 Tex. App. LEXIS 3569, at *4 (noting that defendant who fled jurisdiction and remained at large for over twenty years had set in motion chain of events leading to destruction of court reporter's notes over fifteen years later). Because Castro failed to show that the destruction of the voir dire portion of the reporter's record was "without [his] fault," we conclude that he is not entitled to a new trial under Rule 34.6. *See* Tex. R. App. P. 34.6(f)(2); *Branch*, 2008 Tex. App. LEXIS 3569, at *16 (conclusion that defendant was not entirely without fault for absence of record was "decisive of his claim for relief under appellate rule 34.6(f)"). Further, we conclude that an adequate and effective process was available to Castro under the established authorities setting forth a criminal defendant's right to file an appeal. *See Evitts v. Lucey*, 469 U.S. 387, 392 (1985) (noting that Fourteenth Amendment to United States Constitution guarantees defendant pursuing direct appeal "certain minimum safeguards necessary to make appeal 'adequate and effective'").

A reasonable view of the record supports the district court's denial of Castro's motion for new trial complaining of destruction of the voir dire record; thus, that ruling was not outside the zone of reasonable disagreement. *See Burch*, 541 S.W.3d at 820. Accordingly, we overrule Castro's sixth issue.

## CONCLUSION

Because of the double-jeopardy violation that is clearly apparent from the face of the record, we vacate Castro's conviction on Count 2 for the second-degree felony offense of indecency with a child by sexual contact and the related prison sentence, and otherwise affirm the district court's judgment of conviction on Count 1 for the first-degree felony offense of aggravated sexual assault of a young child.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Triana

Affirmed in Part; Vacated in Part

Filed:   April 30, 2021

Do Not Publish

31